The opinion of the Court was delivered by
Dtjnkin, Ch.
It will be convenient to consider the questions involved in this appeal very much in the order in which they are discussed by the Chancellor. Upon the subject of the *100 amount lost by the default of W. & J. E. Fort, the Chancellor has arrived at a different conclusion from the Master. In November, 1840, the co-partnership, represented by the plaintiff, had funds in the Macon Bank of Georgia. If these funds were appropriated by Watson to his own account, he is responsible. If, on the other hand, the transaction was only a mode adopted by Watson with the consent and co-operation of Cameron, to remit the funds, any loss accruing properly falls on the co-partnership. The evidence is susceptible of either construction. It is very clear that Cameron knew of the transaction in its inception, for he made the draft in favor of Watson, Crews & Co., which was directed to be invested in cotton and consigned to the order of Watson, Crews & Co., at Savannah. Crews says in his evidence the operation was on Watson’s exclusive account. Crews was one of the firm of Watson, Crews & Co. When he states “the transaction was on the individual account of Watson,” the Court understands him only to mean that, though the cotton was to be consigned to the address of Watson, Crews & Co., that firm had no interest or concern in the matter. The debt of W. & J. E. Fort & Co. was originally $1,250 — it was afterwards reduced by payments carried to the credit of the co-partnership, and, in 1852, stood on the books at a balance $518.72, which is charged by the Master to profit and loss account. In consequence of the difficulties in exchange, merchants are, not un-frequently, induced to adopt this mode of remitting funds. It is well illustrated by what is called in the accounts “the Adam Johnson debt,” charged by\the master to the plaintiff’s individual account, and without objection on the part of the plaintiff. The co-partnership had purchased goods in England and were indebted for them. Under such circumstances the ordinary mode of payment is by remittance in sterling exchange — but it sometimes happens that bills are at a high premium and cotton comparatively low, and it may be more advantageous to make payment by shipments to Liverpool. If, in this case, the plaintiff, with the knowledge and *101 consent of his co-partner, had purchased cotton here, and had it consigned to his commercial friends in Liverpool, with instructions to sell, and with the proceeds pay the debt of the firm in Staffordshire, or wherever else their creditor might be, this operation would have been at the risk of the firm, which would be properly so chargeable, if loss accrued. But, so far as the Court can perceive, and it seems to be so conceded,, the purchase of cotton made by the plaintiff was wholly without the knowledge or participation of the defendant, and was for an amount far exceeding the debt due by the firm to their English creditors. The Master has accordingly charged the loss to the individual account of the plaintiff, and he has acquiesced in the judgment. The debt of Fort is analagous; except that it was a mode of procuring a remittance of funds, in another State, belonging to the firm, and not of paying a debt due by the firm abroad. The consequence is different, because it is manifest that, in the Georgia transaction, the plaintiff had knowledge and participation, and it must be inferred that it was with his consent and approbation; and so he seems to have regarded it when his bill was filed. In adverting to the complaints of the defendant on account of the losses incurred by the plaintiff, he says that “if losses occurred from transactions conducted by him, that some losses were also sustained from those conducted by the defendant; for instance, the loss of the sum of $1,250, or thereabouts, funds of the said partnership, received by the said defendant, and lost by him in some purchase oí exchange” (manifestly referring to the Fort debt); and then adds “that, in no case, can partners be thus held responsible for the result of their business operations.” Such is, also, the view which this Court entertains under the circumstances disclosed by the testimony, and are of opinion that the exception should have been overruled.
The subject next considered is in relation to the amount of money or goods to be furnished by the defendant, as provided by the articles of co-partnership. The plaintiff was a young *102 man, without pecuniary means, but having some experience and probably skill in the conduct of a business of this character. The defendant was a merchant of large resources, and the house of S. & J. Watson & Co., of which he was a member, were also importers of the articles of the character of those in the sale of which the new co-partnership was to be employed. The defendant undertook to put into the concern ten thousand dollars, or that amount in goods. The plaintiff was to conduct the business in his own name, the defendant being only a dormant partner, and the plaintiff was to devote his personal services to the management of the concern. No interest was to be allowed on the sum of money, or value of goods, furnished by the defendant, which was to be used for the benefit of the concern. Each party was to receive one-ha.lf of the net profits arising from the business. No provision was made for the contingency that no profits might be made; and no stipulation as to the adjustment of losses as between themselves, in the event that it should prove a losing business. In a note to the S. 26, Story on Partnership, the commentator cites, with apparent approbation, what is stated in another treastise on the same subject: “For in partnerships, where, on the one side, labor is contributed, and on the other, only the use of money, that partner who contributed the money, does not always admit the other to a share of the principal, but only to his share of the profit, which such labor and money joined together might produce. And if A, for instance, who furnishes labor only, hath no title to any part of the money advanced upon dissolving the partnership, so B alone should be liable to the risk of the money as owner thereof; for, in such a case, it is not the money itself, but the risk which it runs, and the probable gain which may accrue from it,-that are to be compared with the labor.” After stating a rule which might be adopted, the writer continues: “According to this rale, if there should be nothing gained by the partnership concern, A would lose his labor, and B his interest, which would be equal and just. And should the *103 original stock be diminished, by the same rule, A loses only his labor, whereas B would lose interest and a part of the principal.”
In this case, the ten thousand dollars was advanced by the defendant, in the hope, and with the reasonable expectation, of realizing from it large profits. At the dissolution, he was entitled to claim it before any division of profits. His co-partner could claim nothing as profits until the amount put in by the defendant was returned. On the other hand, if it was not there, the defendant who had thus risked his property must submit to the loss. At the dissolution of this co-partnership, in 1842, if an assignment of their effects had been made to a third person, it would have been the duty of the assignee to have sold off the stock, collected the assets, and paid the debts of the concern. If the amount realized proved sufficient to pay the debts and return the amount put in by the defendant, and no more, the concern would have made no profits. The defendant would lose the interest on his money, and the. plaintiff would have lost his labor and services for four years. If the assets proved only sufficient to pay the debts and not return the amount put in by the defendant, the deficiency would be his loss, as the plaintiff would have no right of participation, if it had been returned.
But the parties were probably well aware of the ruinous consequences which would attend this summary mode of closing their concern. As has been remarked, the plaintifPs pecuniary means were very limited, while the credit and resources of the defendant were ample. In order to wind up the affairs of the co-partnership in the most advantageous manner, to preserve the credit of the parties, to pay their debts, return the amount put in by the defendent, and save what could be saved for distribution, the plaintiff undertook, by means of the aid and credit of the defendant, or of his firm of S. & J. Watson, through their indorsement, of his paper in bank, to settle up the co-partnership affairs. This was continued for a series of years, certainly until 1845; during *104 which time loans were made from the banks, through the credit of the defendant, large accumulations of interest accrued, but nearly the whole amount put in by the defendant was paid to, or withdrawn by him, with the assent of the plaintiff. In stating the accounts, the defendant has been charged with his proportion of this .accumulation of interest, and of the other expenses, attendant upon this mode of closing the business. The Master states that the large accumulations of interest arose'from, “the extended bank accommodations required for the payment of the debts of the concern,” and that the defendant was made liable in the account, for one half of this accumulation. He has, accordingly, recognized this arrangement of the parties, regarded the premature withdrawal or refunding of the capital of the defendant as made, with the assent of the plaintiff; and while he has refused to allow interest on the defendant’s capital, he has declined to charge interest against the defendant on the amount withdrawn by him. The Court approves the views taken by the Master, and is satisfied with his conclusions thereon.
In respect to the admission of the books and their effect as evidence, the Court deems it necessary to add little to what is said by the Chancellor. It may be remarked, however, that, pending the reference before the Master, these books were, for about six weeks, in the exclusive possession of the defendant. Since that time, (April, 1853,) ample opportunity has been afforded for the most searching scrutiny, as well by the parties and the accountants engaged, as by the Master of this Court. No error is even now suggested in the entries of these books, except one of six hundred dollars, which is satisfactorily explained, and a doubt as to a charge made in 1841, during the existence of the co-partnership, when (as appears not to -be questioned) the books afforded, at least, prima facie evidence of the transactions therein entered.
But the Chancellor, in concluding his decree, observes that “ the manner in which the account is made up is not very intelligible to him, probably (as he says) from his want of *105 familiarity with the mode of stating mercantile accounts, and that he is not satisfied that justice has been done by this manner of stating the accounts.” He therefore sustained the defendant’s exceptions as to the mode of statogafeh^cfe^mints. From this part of the decree the ])lain|^&Sja^^Ej!IbqL because, as he submits, after the procp<&lgs in the^cáfi^se, wheir the account had been fairly ano>fimy takh^^y’me accountant selected by the defendant nfeleu', re-examin|d before the Master, and reported on by|him,.ttyeW^'ancejlor should have sustained the report, exceptM such j»#irticu-lars as to which some specific error or nuSféStNIfas been shewn.”
These proceedings, for an account, were instituted in 1851. Several pleas were interposed, which were overruled by Chancellor Johnston, October, 1852, and a decree to account made, which was sustained by this Court in January, 1853. The case was referred to Master Tupper, and his minutes of the proceedings before him were in evidence before the Court. From these it appears that, after several preliminary proceedings in February, March and April, 1853, on 13th April an account was submitted by the defendant, and the counsel of the defendant proposed the appointment of an accountant for each party, to make up account from the books; and the defendant’s solicitor named, on his part, Mr. Heriot; the other side consented to the reference proposed, and named the same referee. Whereupon, under the act of 1840, which authorizes Masters or Commissioners to make all such orders as may be necessary to prepare causes for hearing upon the merits, the following orders were made, with the assent of the parties: Ordered, That the books of Cameron & Watson be referred to W. B. Heriot to make up account, and that said account be basis of Master’s report. Ordered, That this reference to Mr. Heriot is not intended to prevent either party from offering evidence before the Master, extrinsic of books, to invalidate the account when rendered by Mr. Heriot. Ordered, That the Master hear evidence as *106 to the value of the wages of a packer,’ and direct accountant as to the proper entries to be made in the account when desired — each party to furnish statement if they please. The books and papers were accordingly placed in the hands of Mr. Heriot, and the sum of five hundred dollars was-paid to him by the parties. He kept the books, &c., for some thirteen months, and, on 17th May, 1854, his account was submitted. According to the order of April, 1853, this account was made the basis of the Master’s report, which, after various references, was filed on 12th June, 1855.
Mr. Heriot was admitted to be one of the most experienced and skilful accountants in the city of Charleston. The exceptions filed by the defendant present no objections to his ability, or the fidelity with which he discharged his duty. So far as the Court can understand, no account was made up by the defendant, or by any accountant, upon the principles which he suggests. In the course of the argument it was urged that, after the dissolution in 1842, it was the duty of the plaintiff to have closed the concern, as an executor or administrator would have managed the estate of his testator, or intestate, and that the account should be now stated as if he had proceeded in this manner. But the answer to this is, that the defendant sanctioned and approved a different mode of proceeding on the part of the plaintiff. As has been already stated, this was probably done fully as much for the purpose of protecting his own interests as those of the plaintiff after the dissolution. The notes of the plaintiff in bank, discounted, as the Master states, for the purpose of paying the debts of the concern, were regularly indorsed by the defendant, or his mercantile firm. “These indorsements,” says one of the witnesses, “ were a mere continuation of the paper existing before the dissolution, or made to take up the old liabilities. After the dissolution (says the witness) Watson continued frequently to confer with Cameron as to the business of the firm. These renewals continued to 1845, and several years longer, and also the consultations of Watson with *107 Cameron in relation to the business of the firm; and Cameron continued to render him accounts of the concern and its business.” Another witness (who became a partner of the defendant in mercantile business in 1839,) testified that, “he knew of plaintiff’s rendering accounts of the firm of Cameron & Watson to the defendant, from their dissolution in 1842 to about 1st June, 1847, and that the account (K) was one of them, and of the form in which they were usually made.” Under these circumstances it is no matter of surprise that, at the reference before the Master in April, 1853, the defendant, after several weeks scrutiny of the books in which the transactions were entered, instead of arraigning the course of proceeding pursued by the plaintiff in winding up the affairs of the concern, proposed, through his counsel, that an accountant should be appointed “to make up the account from the books,” and cooperated in obtaining the order thereafter made, that the account, so to be made, should “be the basis of the Master’s report.” To prevent any misconception or conclusion of either party, it was further provided that either party might offer evidence before the Master “extrinsic of the books, to invalidate the account, when rendered by the referee;” and further, the Master was instructed to take evidence on a particular subject not embraced in the books, and direct the accountant as to the proper entries when desired. The account was accordingly made from the books, and forms the basis of the Master’s report. After what had thus passed, we are all of opinion that it was too late for the defendant to repudiate what had been done, and to require a new account to be made up, framed upon different principles, and applicable to a course of proceeding essentially different from that which he had himself sanctioned.
After a review of the several exceptions on the part of the plaintiff and defendant to the Master’s report of 12th June, 1855, and without intending to impugn the abstract propositions affirmed in some of them, the Court is of opinion,that the same should have been overruled, and that the report, *108 as corrected by his report on the exceptions, 29th June, 1855, should have been confirmed and made the judgment of the Court. It -is now so ordered, and decreed, and the decree of the Circuit Court is reformed accordingly.
Dar&an and Wardi, aw, CC,, concurred.

Decree reformed.